**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**HUNTINGTON DIVISION**

**JOHNNY FINLEY,
o/b/o TERESA G. FINLEY,**

      **Plaintiff,**

**v.**                                   **Case No.: 3:12-cv-07908**

**CAROLYN W. COLVIN,
Acting Commissioner of the
Social Security Administration,**

      **Defendant.**

**<u>PROPOSED FINDINGS AND RECOMMENDATIONS</u>**

This action seeks a review of the decision of the Commissioner of the Social Security Administration (hereinafter "Commissioner") denying Claimant's application for supplemental security income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. This case is assigned to the Honorable Robert C. Chambers, United States District Judge, and was referred to the undersigned United States Magistrate Judge by standing order for submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are the parties' cross-motions for judgment on the pleadings as articulated in their briefs. (ECF Nos. 12, 13).

The Court has fully considered the evidence and the arguments of counsel. For the reasons set forth below, the undersigned **RECOMMENDS** that the decision of the Commissioner be **REVERSED**, and that this case be **REMANDED** for further proceedings consistent with this opinion.

1

## I.    Procedural History

Teresa G. Finley ("Claimant") filed the instant SSI application on July 24, 2008, (Tr. at 151), alleging disability due to cirrhosis, bipolar disorder, depression, and panic attacks. (Tr. at 164). The Social Security Administration ("SSA") denied Claimant's application initially and upon reconsideration. (Tr. at 67, 71). Claimant filed a request for an administrative hearing, (Tr. at 74), which was held on November 1, 2010 before the Honorable Caroline H. Beers, Administrative Law Judge ("ALJ"). (Tr. at 38-63). By written decision dated November 17, 2010, the ALJ found that Claimant was not disabled as defined in the Social Security Act. (Tr. at 24-37). On January 13, 2011, Claimant filed a request for review by the Appeals Council. (Tr. at 20). On October 7, 2011, while the request was pending, Claimant passed away. (Tr. at 19). The ALJ's decision became the final decision of the Commissioner on September 12, 2012, when the Appeals Council denied Claimant's request for review. (Tr. at 1-4).

Plaintiff Johnny Finley, Claimant's surviving husband acting on her behalf, timely filed the present civil action seeking judicial review pursuant to 42 U.S.C. § 405(g). (ECF No. 2). The Commissioner filed an Answer and a Transcript of the Administrative Proceedings, (ECF Nos. 9, 10), and both parties filed memoranda in support of judgment on the pleadings. (ECF Nos. 12, 13). Consequently, the matter is fully briefed and ready for resolution.

## II.    Claimant's Background

Claimant was twice previously granted SSI benefits. She filed her first SSI application on April 17, 1978, and was granted benefits which lasted until August 2000, when her benefits were ceased after a continuing disability review. (Tr. at 24). Claimant filed a second SSI application on March 12, 2002, and was granted benefits in

September 2004 after meeting the requirements of Listing 12.05C due to mental retardation, anxiety, and post-traumatic stress disorder. (*Id.*). Claimant's benefits ceased in 2007, when she was incarcerated for drug trafficking. (*Id.*). Following her release from prison, Claimant filed the instant SSI application. (*Id.*). Claimant was 35 years old at the time of her application for benefits, and 37 years old at the time of her administrative hearing. (Tr. at 35, 151). She completed tenth grade and communicated in English. (Tr. at 46). Her prior employment history included a three-month period in 1997 making sandwiches at a restaurant, but no other substantial gainful activity. (Tr. at 57-58). As previously stated, Claimant passed away on October 7, 2011. (Tr. at 19).

## III.    Summary of ALJ's Decision

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. *See Blalock v. Richardson,* 483 F.2d 773, 775 (4th Cir. 1972). Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Social Security regulations establish a five step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary and benefits are denied. 20 C.F.R. § 416.920(a)(4). The first step in the sequence is determining whether a claimant is currently engaged in substantial gainful employment. *Id.* § 416.920(b). If the claimant is not engaged in substantial gainful employment, then the second step requires a determination of whether the claimant suffers from a severe impairment. *Id.* § 416.920(c). If severe impairment is present, the third inquiry is whether this

3

impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4 (the "Listing"). *Id.* § 416.920(d). If so, then the claimant is found disabled and awarded benefits.

However, if the impairment does not meet or equal a listed impairment, the adjudicator must determine the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* § 416.920(e). After making this determination, the next step is to ascertain whether the claimant's impairments prevent the performance of past relevant work. *Id.* § 416.920(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability, and the burden shifts to the Commissioner to demonstrate, as the final step in the process, that the claimant is able to perform other forms of substantial gainful activity, when considering the claimant's remaining physical and mental capacities, age, education, and prior work experiences. 20 C.F.R. § 416.920(g); *see also McLain v. Schweiker,* 715 F.2d 866, 868-69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger,* 538 F.2d. 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the SSA "must follow a special technique at each level in the administrative review process," including the review performed by the ALJ. 20 C.F.R. § 416.920a(a). Under this technique, the ALJ first evaluates the claimant's pertinent signs, symptoms, and laboratory results to determine whether the claimant has a medically determinable mental impairment. *Id.* §

4

416.920a(b). If an impairment exists, the ALJ documents his findings. Second, the ALJ rates and documents the degree of functional limitation resulting from the impairment according to criteria specified in the regulations. *Id.* § 416.920a(c). Third, after rating the degree of functional limitation from the claimant's impairment(s), the ALJ determines the severity of the limitation. *Id.* § 416.920a(d). A rating of "none" or "mild" in the first three functional areas (limitations on activities of daily living, social functioning, and concentration, persistence or pace) and "none" in the fourth (episodes of decompensation of extended duration) will result in a finding that the impairment is not severe unless the evidence indicates that there is more than minimal limitation in the claimant's ability to do basic work activities. *Id.* § 416.920a(d)(1). Fourth, if the claimant's impairment is deemed severe, the ALJ compares the medical findings about the severe impairment and the rating of the degree of functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment meets or is equal to a listed mental disorder. *Id.* § 416.920a(d)(2). Finally, if the ALJ finds that the claimant has a severe mental impairment, which neither meets nor equals a listed mental disorder, the ALJ assesses the claimant's residual mental function. 20 C.F.R. § 416.920a(d)(3). The Regulations further specify how the findings and conclusion reached in applying the technique must be documented by the ALJ, stating:

> The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each functional areas described in paragraph (c) of this section.

*Id.* § 416.920a(e)(4).

When a claimant is found disabled and there is medical evidence of drug addiction or alcoholism, the ALJ must conduct a further evaluation to "determine

whether [her] drug addiction or alcoholism is a contributing factor material to the determination of disability." *Id.* § 416.935(a). The key issue in this analysis is whether the claimant would still be found disabled if she stopped using drugs or alcohol. *Id.* § 416.935(b). In making the determination, the ALJ will "evaluate which of [the claimant's] limitations ... would remain if [she] stopped using drugs or alcohol and then determine whether any or all of [her] remaining limitations would be disabling." *Id.* § 416.935(b)(2). If a claimant's remaining limitations would not be disabling, then her addiction is considered a contributing factor material to the determination of disability, *id.* § 416.935(b)(2)(i), and the claimant is not considered disabled within the meaning of the Social Security Act. 42 U.S.C. § 423(d)(2)(C). If a claimant's remaining limitations are still disabling, then the claimant is considered "disabled independent of [her] drug addiction or alcoholism and [the ALJ] will find that [the claimant's] drug addiction or alcoholism is not a contributing factor material to the determination of disability." 20 C.F.R. § 416.935(b)(ii).

Here, the ALJ confirmed at the first step of the sequential evaluation that Claimant had not engaged in substantial gainful activity since July 24, 2008, the application date. (Tr. at 27, Finding No. 1). At the second step of the evaluation, the ALJ listed the following severe impairments attributed to Claimant: "status post splenectomy, mental retardation, anxiety, depression, post-traumatic stress disorder (PTSD), cocaine abuse in questionable remission, alcohol abuse, substance abuse, and congenital cirrhosis." (*Id.*, Finding No. 2). However, in her analysis, the ALJ reached a contradictory conclusion that Claimant's "liver and spleen impairments are nonsevere." (Tr. at 27). Under the third inquiry, the ALJ determined that Claimant's impairments, when including her substance use disorders, met Listing 12.05C (Intellectual disability).

6

(Tr. at 29, Finding No. 3).

The ALJ then determined that if Claimant stopped abusing substances, her remaining limitations would cause more than a minimal impact on her ability to perform basic work activities; that is Claimant would continue to have a severe impairment or combination of impairments. (Tr. at 31, Finding No. 4). However, the ALJ found that "while the claimant's limited intellectual functioning level may still exist, the claimant's remaining mental health impairments are the result of continued alcohol and drug use and would not be material if the claimant were to stop her use." (Tr. at 31). Thus, the ALJ found that if Claimant stopped substance abuse, she would not have an impairment or combination of impairments that met or medically equaled any listed impairments. (Tr. at 32, Finding No. 5).

Accordingly, the ALJ assessed Claimant's RFC if she were to stop abusing substances, finding that:

> If the claimant stopped the substance use, the claimant would have the residual functional capacity to perform less than a full range of medium work as defined in 20 C.F.R. § 416.967(c). She is limited to performing simple tasks consistent with SVP 2 entry level work as defined by the Dictionary of Occupational Titles; can have occasional interaction with coworkers and supervisors and no interaction with the public; can make simple work related decisions with few workplace changes; and can concentrate for two hour blocks throughout an eight hour day.

(Tr. at 32, Finding No. 6). The ALJ noted that Claimant had no past relevant work. (Tr. at 35, Finding No. 7). Therefore, the ALJ considered Claimant's age and education in combination with her RFC to determine her ability to engage in substantial gainful activity. (Tr. at 35-37, Finding Nos. 8-11). The ALJ noted that (1) Claimant was born in 1973 and was defined as a younger individual; (2) she had limited education and could communicate in English; and (3) transferability of job skills was not an issue because she had no past relevant work. (Tr. at 35-36, Finding Nos. 8-10). Taking into account

7

these factors and Claimant's RFC if she were to stop abusing substances, as well as the testimony of a vocational expert, the ALJ found that Claimant could perform jobs at the medium, light, and sedentary level, which were available in significant numbers in the national economy. (Tr. at 36-37, Finding No. 11). For example, Claimant could perform the jobs of laundry worker and hand packer at the medium level; grader/sorter and assembler at the light level; and hand packer and marker at the sedentary level. (Tr. at 36). Thus, the ALJ concluded that Claimant's substance abuse was a contributing factor material to the determination of disability, and Claimant would not be disabled if she stopped abusing substances. (Tr. at 37, Finding No. 12). Accordingly, the ALJ determined that Claimant was not entitled to benefits. (*Id.*).

## IV.   **Plaintiff's Argument**

Plaintiff argues that the Commissioner failed to appropriately evaluate whether Claimant met Listing 12.05C with respect to her physical impairments. (ECF No. 12 at 4). According to Plaintiff, the ALJ should have evaluated whether her status post splenectomy and congenital cirrhosis, which were identified as severe impairments, combined with her diagnosis of mild mental retardation, satisfied the requirements for Intellectual Disability under listing 12.05C. (*Id.* at 4-6). Plaintiff urges the Court to find Claimant disabled under that listing, or in the alternative, to remand the case for further consideration of her limitations. (*Id.* at 6-7).

In response, the Commissioner argues that the ALJ reasonably determined that Claimant's impairments did not equal listing 12.05C. (ECF No. 13 at 9). According to the Commissioner, the Claimant's "spleen and liver impairments were appropriately deemed non-severe," and the record is void of both a "valid verbal, performance, or full scale IQ of 60 through 70," as well as any evidence of limitations that resulted from her

spleen and liver impairments. (*Id.* at 11-12).

## V.   **Relevant Medical History**

The Court has reviewed the transcript of proceedings in its entirety including the medical records in evidence. The Court has confined its summary of Claimant's treatment and evaluations to those entries most relevant to the issues in dispute.

### A. Treatment Records

#### *1. Evidence of Substance Abuse*

In July and August 2003, Claimant was admitted to Cabell Huntington Hospital on multiple occasions with requests for pain medication and prescription refills for Xanax and Lortab. (Tr. at 281-311). During that time, Claimant tested positive for cannabinoids, (Tr. at 289, 290), and was diagnosed with "narcotic and benzo addiction – drug seeking behavior." (Tr. at 309, 311).

On June 12, 2004, Claimant was admitted to Cabell Huntington Hospital for drug overdose, (Tr. at 273-80), after consuming three Propranolol pills, four Tylenol, and "a few beers." (Tr. at 273, 279). Claimant also tested positive for cannabinoids and benzodiazepine. (Tr. at 275-76). After remaining in stable condition overnight, Claimant was discharged the following day. (Tr. at 279-80).

On September 6, 2004, Claimant was admitted to Cabell Huntington Hospital, alleging abdominal pain. (Tr. at 322-37). Treatment notes reflect that she appeared drunk and tested positive for cocaine, benzodiazepine, amphetamines, and cannabinoids. (Tr. at 324, 328-29, 334). Claimant was diagnosed with polysubstance abuse and abdominal pain, and discharged the same day. (Tr. at 329-30).

On February 7, 2005, Claimant was admitted to Cabell Huntington Hospital, (Tr. at 354-65), with complaints of anxiety and suicidal notions. (Tr. at 355). Claimant tested

positive for cocaine, cannabinoids, and benzodiazepines, (Tr. at 365), and a blood alcohol level of .15%. (Tr. at 360). Claimant reported "drinking 3 beers, 1 wine, 1 joint," and taking a Zanaflex, but denied cocaine use.  (Tr. at 355, 360). Treatment notes reflect that Claimant had a "history of treatment at Prestera" but was currently "non-adherent to treatment." (Tr. at 360). The hospital physician declined to write any prescriptions for Claimant due to her behaviors. (*Id.*). Claimant was diagnosed with suicidal gestures and substance abuse, and discharged later the same day with instructions to follow up at Prestera. (Tr. at 363).

On January 20, 2006, Claimant was admitted to King's Daughters Medical Center (KDMC), (Tr. at 598-608), with complaints of knee and coccyx pain resulting from assault. (Tr. at 599). Claimant was observed to have slurred speech, and tested positive for benzodiazapines. (Tr. at 599, 605). Claimant's lumbar spine x-ray results reflected "no acute finding," and she was discharged the same day. (Tr. 602, 607). Claimant returned to KDMC on January 21, 2006, (Tr. at 585-97), with complaints of ongoing pain from the prior assault. (Tr. at 586). Claimant denied any prior history of inpatient psychiatric treatment, (Tr. at 592), and denied any history of alcohol use, but "later stated she had one alcohol (1 drink) prior to coming to the hospital." (Tr. at 593). She also tested positive for benzodiazepines and opiates. (Tr. at 586, 597). Treatment notes reflect that Claimant "appears to have PTSD" but that she refused admission to the behavioral medicine unit. (Tr. at 586, 595). On January 25 & 27, 2006, Claimant returned to KDMC with complaints of continued tailbone pain, for which she received additional pain medication. (Tr. at 568-84).

On February 17, 2006, Claimant was admitted to KDMC for drug overdose (Tr. at 556-66), after consuming 3 shots of Jagermeister and 2 Xanax pills. (Tr. at 556).

Claimant's speech was slurred and she became combative during hospitalization. (Tr. at 556-57). Claimant tested positive for benzodiazepines, cocaine, barbiturates, and a blood alcohol level of .149%. (Tr. at 564, 566). Claimant was discharged later that day, with instructions to follow up at Pathways for detoxification and substance abuse treatment. (Tr. at 560).

On April 5, 2006, Claimant was admitted to KDMC with complaints of continued tailbone pain. (Tr. at 552-55). She was advised that she would "be discharged with Motrin," but left the hospital prior to discharge. (Tr. at 552, 554). Claimant returned to KDMC on April 7, 2006, again with complaints of tailbone pain. (Tr. at 544-50). Treatment notes reflect that "patient and family appear under the influence of substance/ETOH." (Tr. 546). Claimant's sacrum/coccyx x-ray results reflect "rather markedly anteriorly directed top of the coccyx" but "initially it is not considered the result of an acute bone or joint injury." (Tr. at 550). Claimant was prescribed pain medication and discharged later that day. (Tr. at 544, 549).

On July 4, 2006, Claimant was admitted to KDMC "secondary to suicidal ideations" after she "apparently drank a fifth of vodka as well as having taken Xanax and Zanaflex pills." (Tr. at 471). Claimant's speech was slurred and she tested positive for benzodiazepines, cocaine, and a blood alcohol level of .157%. (Tr. at 471-72, 507-08). Claimant was diagnosed with cocaine abuse, electrocardiogram changes with sinus pauses, alcohol abuse, medication abuse, and suicidal ideations, (Tr. at 472, 476), and was transferred to the behavioral medicine unit for psychiatric evaluation. (Tr. at 472, 478).

On November 4, 2006, Claimant was admitted to KDMC with complaints of rape perpetrated by three unknown men. (Tr. at 443). Later, Claimant reported that two men

were involved. (Tr. at 438-39). Claimant was observed to be intoxicated at the time of admittance. (Tr. at 438, 442). Patient refused both Toradol and Tylenol, and requested narcotics for pain relief. (Tr. at 444). The treating physician declined to provide narcotics, stating that she "wanted to get [Claimant] to hospice care and they can get her psychological help and any anxiolytic or any pain medicine after they examine her." (Tr. at 439). Although initially willing to undergo a rape kit exam, Claimant became belligerent after being refused narcotics, and instead chose to sign out of the hospital against medical advice. (Tr. at 444-45). During sign out, Claimant's husband "state[d] Xanax was stolen" from her, and requested "4 one-mg pills to go." (Tr. at 445). However, Claimant's treating physician "thought that she needed to be more lucid and did not want to give her any pain medicine." (Tr. at 439).

On January 2, 2007, Claimant was admitted to KDMC for suicidal gestures. (Tr. at 413-37). Claimant reported that she "couldn't take no more" and multiple lacerations were noted on her arm. (Tr. at 413-15). Claimant's speech was slurred, and she "appear[ed] impaired, unable to keep eyes open." (Tr. at 414). Claimant admitted to drinking alcohol the night before, but denied drug use, (Tr. at 415), although she did admit to regularly using illegal drugs, including snorting cocaine, and regularly drinking alcohol. (Tr. at 423). Claimant tested positive for benzodiazepines and cocaine, and a blood alcohol level of .116%. (Tr. at 424, 434, 436). Claimant was admitted to the behavioral medicine unit. (Tr. at 420).

### 2. Mental Health Treatment

On September 15, 2005, Claimant began mental health treatment at Pathways, Inc. (Tr. at 368-89). In her diagnostic screening assessment, Claimant reported experiencing ADHD, poor concentration, difficulty sleeping, and severe panic attacks.

(Tr. at 378). Claimant relayed that she was "currently in an abusive marriage of one year, but separated from husband earlier this week after he hit her." (Tr. at 378). Claimant reported consuming alcohol "very occasionally only," (Tr. at 379), and indicated that "when on meds, [her] symptoms are well controlled" (Tr. at 380). Claimant's mental status exam reflected that her mood was anxious, but otherwise was entirely within normal limits. (Tr. at 379). Claimant was diagnosed with ADHD, NOS (by history) and Physical Abuse of an Adult Victim, and assessed a GAF score of 60. (Tr. at 381). On October 7, 2005, Claimant reported feeling anxious, and was observed to be very tearful and depressed. (Tr. at 389). No prescriptions were given to her that day. (*Id.*). On January 6, 2006, Claimant reported "feeling alright when she takes her medication," and was prescribed Ritalin. (*Id.*). On February 10, 2006, Claimant showed an "improved" response and she was observed to be in stable condition. (Tr. at 387). On May 5, 2006, Claimant was again observed to be in stable condition, with an "improved" response. (Tr. at 388). On August 29, 2006, Claimant's response was listed as "partial benefit," as she reported that she hadn't been taking her prescribed Ritalin, and that she had been consuming excessive amounts of sugar and caffeine. (Tr. at 385).

On April 27, 2007, Claimant resumed treatment at Pathways.[1] (Tr. at 370-77).  In her diagnostic screening assessment, Claimant reported that she had been treated for ADHD for years and had "been out of medication for approximately 4 months." (Tr. at 372). She reported feeling "very restless, can't sit still, has problems sleeping, is irritable, and hyper most of the time," but that "medication has helped her in the past." (*Id.*). Claimant's mental status exam was essentially within normal limits, except that her

---

[1] Claimant was incarcerated for drug trafficking at some point in 2007. (Tr. at 47-49). During a 2008 psychological evaluation, Claimant reported that she had received mental health services from Pathways while incarcerated. (Tr. at 611). However, the record does not clearly indicate whether Claimant resumed treatment at Pathways prior to or subsequent to her incarceration.

sustained mood was observed as anxious, and her psychomotor activity was fidgety/restless. (*Id.*). Claimant denied substance use, and the therapist noted that "Client is able to function well in most situations." (Tr. at 373-74). Claimant was diagnosed with Attention-Deficit/Hyperactivity Disorder NOS and Anxiety Disorder NOS, and assigned a GAF score of 57.  (Tr. at 375). Claimant was referred for a medication evaluation, but "did not want therapy." (*Id.*). On May 4, 2007, Claimant's response was listed as "worse" and she reported that she hadn't been taking her medication for 4-5 months. (Tr. at 385). Claimant was again prescribed Ritalin. (*Id.*). On July 25, 2007, Claimant complained of not sleeping well. (Tr. at 386). Claimant was prescribed Elavil and instructed to follow up with the jail physician. (*Id.*). On August 14, 2007, Claimant's treatment/service plan reflected a diagnosis of ADHD NOS, Anxiety D/O NOS, and an assigned GAF score of 57 (Tr. at 368). Claimant agreed to attend all scheduled appointments, take medication as prescribed, and attend individual therapy as needed. (Tr. at 369).

Claimant was released from incarceration on July 22, 2008. (Tr. at 690). On October 14, 2008, Claimant was admitted to KDMC with complaints of panic attacks. (Tr. at 640-47). Claimant reported that she had been out of medications for 17 months. (Tr. at 642). Claimant was diagnosed with Acute Anxiety and discharged later that day with instructions to "follow up with Pathways as directed." (Tr. at 644).

On October 23, 2008, Claimant resumed treatment at Pathways. (Tr. at 691-98). She completed a biopsychosocial assessment, which reflected that Claimant "would like to be back on medication." (Tr. at 692). Claimant reported that she had previously "been treated for ADHD for years and has been in jail for the last 16 months for drug trafficking," and claimed to have been "set up." (Tr. at 693). Claimant described

symptoms of feeling very restless, being unable to sit still, difficulty sleeping, irritability, and feeling hyper, and reported that she hadn't slept in 4 days. (*Id.*). Claimant denied current substance use and indicated that medication had helped her in the past. (*Id.*). Claimant was diagnosed with Anxiety Disorder NOS and assigned a GAF score of 55. (Tr. at 695-96). At her Initial Psychiatric Assessment on October 30, 2008, Claimant complained of "inattention, racing thoughts, and [being] unable to focus," as well as sleeping 3-4 hours per night, "grieving from the recent loss of her father," and experiencing increased anxiety. (Tr. at 690). She also stated that "she wants to get back on her previous meds." (*Id.*). Claimant's mental status exam reflected that Claimant's mood was anxious and affect was congruent, but was otherwise within normal limits. (*Id.*). Claimant was diagnosed with ADHD "by history," Anxiety disorder, and PTSD "per client report," and assigned a GAF score of 60. (*Id.*).

On April 15, 2009, Claimant was admitted to KDMC's behavioral medicine unit with complaints of "an upsurge in anxiety and self-destructive behavior" beginning about two weeks prior. (Tr. at 798). Claimant stated that she cut herself to stop the panic, but she was not trying to kill herself. (*Id.*). Claimant reported a long history of panic "associated with flashbacks to earlier abuse," which increased following a car accident in 2002, in which her sister was killed and Claimant was the driver. (*Id.*). Claimant also reported that her panic had been "controlled with a combination of Prozac 40 mg and Xanax 1 mg 3 times a day, however, she stopped this a couple months ago for some unknown reason." (*Id.*). Claimant's mental status exam was essentially within normal limits, except that her "mood [was] mildly dysphoric and affect was mildly constricted but appropriate." (Tr. at 799). Claimant's intelligence appeared "average from her vocabulary, use of concepts and fund of knowledge." (*Id.*). Claimant was

diagnosed with "post-traumatic stress disorder, chronic, with acute exacerbation," "depression, not otherwise specified, rule out major depression, severe with psychotic features," and "anxiety, not otherwise specified with panic and agoraphobia," and assigned a GAF score of 36. (Tr. at 799-800). During a family meeting on April 16, 2009, Claimant "reported she had been off her medications for several months and has been having increasing anxiety and panic attacks," and "requested being put back on her medications." (Tr. at 800). That same day, Claimant reported to another therapist that "she stopped taking her medicine 2 years ago because she doesn't like to take medications" but stated that "when she is on her medication she does much better and doesn't self-mutilate." (Tr. at 801). Claimant was observed to be "tearful during interview," but stated that "she wants to get help and is willing to take medication and go to therapy." (*Id.*). Claimant was discharged on April 18, 2009, with instructions to follow up at Pathways. (Tr. at 806).

In June 2009, Claimant was incarcerated for violating her parole conditions, and therefore received medical and mental health treatment from the Kentucky Department of Corrections until her release in July 2010. (Tr. at 809-69). According to intake records dated June 3, 2009, Claimant admitted to using hard liquor on a weekly basis, snorting and smoking cocaine twice per month, using Xanax, occasionally smoking marijuana, and using Percocet two to three times per month, with her last use of liquor, cocaine, and Percocet occurring on May 10, 2009. (Tr. at 866). Elsewhere during intake, Claimant admitted to having a history of daily alcohol and drug use dating back eight years prior. (Tr. at 869). An intake assessment was conducted on June 5, 2009, during which Claimant's mental status exam was entirely within normal limits. (Tr. at 862).

On July 4, 2009, Claimant reported feeling "that she wants to cut on herself," and "requested to be restarted on some of her meds but at a reduced dose." (Tr. at 858). Claimant had previously "signed a refusal on all of her psych meds because she felt over medicated." (*Id.*). On July 28, 2009, Claimant's mental status exam reflected that her affect was blunted; her mood was anxious and depressed; and otherwise was observed to be within normal limits. (Tr. at 856). Claimant's intelligence was again observed to be "about average." (*Id.*). Claimant reported dissatisfaction with her medication due to symptoms of "heaviness in breathing, sedating, grogginess," and requested that her medication be changed. (Tr. at 857). In August 2009, Claimant reported symptoms of anxiety, auditory hallucinations, and mood swings, but repeatedly refused her prescribed medication and requested different medication. (Tr. at 851-53). A mental status exam dated August 23, 2009 reflects that Claimant's mood and affect were irritable, but was otherwise unremarkable. (Tr. at 851). On October 8, 2009, Claimant's mental status exam reflected that she "appeared more depressed/dysphroic than anxious," while her mood was observed as moderately anxious and mildly depressed. (Tr. at 846). Claimant reported fear of going into the general population, and "[n]oted decreased frequency of anxiety attacks" in her current placement. (*Id.*). She complained of social anxiety, panic attacks, and a "history of such in community." (*Id.*). Claimant requested placement in the psychiatric care unit, but was "deemed not appropriate at this time," as her psychologist noted that Claimant "appears to [be] functioning adequately despite anxiety." (Tr. at 847). On November 4, 2009, Claimant reported that "she has been really depressed and has been having vivid nightmares." (Tr. at 843). Claimant's mood was sad and her affect was congruent, while all other aspects of her mental status exam were unremarkable. (*Id.*). Claimant's medication was adjusted

accordingly. (*Id.*). On December 1, 2009, Claimant reported that "she was hallucinating that spiders were crawling all over her and biting her." (Tr. at 842). The treating nurse noted that Claimant "had missed a couple days of medicine," to which Claimant responded that "she wanted to work and [when] taking the meds at night she couldn't get up in the morning." (*Id.*).

On February 18, 2010, Claimant reported that "she is not taking Prozac as it is causing problems and has been having anxiety, mood swings and insomnia." (Tr. at 830). Claimant requested another medication to help with her symptoms. (*Id.*). Claimant's observed mood and psychomotor activity were anxious and her affect was sad, but otherwise Claimant's mental status exam was unremarkable. (*Id.*). On April 28, Claimant reported continuing to feel "very sad and anxious" and requested that her medications be adjusted. (Tr. at 815). Claimant's mood was sad and her psychomotor activity and affect were anxious while all other aspects of her mental status exam were unremarkable. (*Id.*). Claimant's medication was adjusted accordingly. (Tr. at 816). Claimant was released from prison in July 2010. (Tr. at 24).

On September 20, 2010, Claimant completed an intake assessment at Prestera Centers "to reinstate her psychiatric services" following her release from prison. (Tr. at 872). Claimant reported current symptoms of "mood lability ranging from moderate mania to depression; initial & middle insomnia; anxiety with panic & agoraphobia; vague AH and feelings of paranoia; poor appetite & concentration; low energy; and social withdrawal." (*Id.*). Claimant relayed her past history of suicidal gestures and crack cocaine dependence "but allege[d] she had been clean since going into prison in 2007." (*Id.*). Claimant reported that "her husband does all the shopping and errands," but that she "can complete all self-care ADLs without assistance" although she "sometimes lets

household chores slide, when she is very depressed." (*Id.*).  Claimant's mental status exam reflected that her sociability was inhibited, coping ability was deficient, and affect was blunted, but her appearance, speech, thought content, orientation, and recall memory were all within normal limits or otherwise appropriate. (Tr. at 879-80). Claimant was diagnosed with "Bipolar Disorder NOS" and "Anxiety Disorder NOS" with notes indicating "R/O Panic Disorder with agoraphobia, R/O PTSD," and assigned a GAF score of 55. (Tr. at 873).

### 3. Liver and Spleen Treatment

On September 22, 2008, Claimant was admitted to KDMC, reporting pain in her lower right side. (Tr. at 657). A CT scan reflected "probable appendicitis as well as incidental ureteral stones that are non-obstructing and a possible left renal mass." (Tr. at 670). Claimant underwent an appendectomy that same day, which she tolerated well, and was subsequently "taken to the post-operative recovery room in satisfactory condition." (Tr. at 670, 717). Further MRI evaluation of the left renal mass, (Tr. at 764-79), revealed a "left retroperitoneal mass which is either originating exophytically from inferior pole of the left kidney or abutting the inferior pole left kidney," although the reviewing physician noted that it was "incompletely evaluated as patient refused gadolinium." (Tr. at 764).

On September 26, 2008, Claimant was admitted to KDMC for "abdominal pain s/p appendectomy Tuesday" and vomiting with a fever of 101° F, but left that same day after refusing medical examination and treatment. (Tr. at 648-50). On September 30, 2008, Claimant attended a post-operative visit, during which she reported experiencing moderate pain since the surgery, but that she had returned to limited activities. (Tr. at 719). The physician noted that Claimant was "doing well after appendectomy," there was

"no indication of significant postoperative complications," and that Claimant would "follow up with Dr. Dixon for left kidney mass." (Tr. at 720).

On November 24, 2008, Claimant was admitted to KDMC with complaints of "uncontrolled anxiety and depression" due to running "out of all her meds," as well as pain in her right flank. (Tr. at 743-44). Claimant's medication was refilled and she was referred to the urology department. (Tr. at 744). A CT scan of Claimant's abdomen and pelvis revealed "very small stones [but] no evidence of ureteral stone," as well as "continued evidence for a left infrarenal mass which could be related to the kidney or to the mesentery" and "hypodense areas in the left kidney and on the right [which] could be related to renal parenchyma." (Tr. at 759-63).

On December 2, 2008, Claimant was admitted to KDMC with complaints of "a 2-month history of low grade, intermittent, left flank pain that has become particularly severe of over the past several days." (Tr. at 745). Claimant's NM Liver Spleen Scan revealed a "5 cm left infrarenal splenule," "presence of persistent blood pool activity suggest[ing] hepatocellular dysfunction," and "probable mild colloid shift." (Tr. at 747). A CT scan of Claimant's abdomen and pelvis reflected that the "left infrarenal mass [was] stable" and "most likely represents an accessory hypertrophied splenule/splenic rest in this patient status post splenectomy." (Tr. at 754).

On January 7, 2009, Claimant was admitted to KDMC for anxiety regarding her impending voluntary accessory splenectomy. (Tr. at 781-92). Treatment notes reflect that at the time of admittance, Claimant had "developed significant anxiety and she requires a significant amount of Xanax." (Tr. at 790). The hospital physician further noted that Claimant was "crying and lost the pills twice and she is asking me for more pills and I just do not think it is wise to keep medicating this woman." (*Id.*). Claimant

20

reported that she "does not drink" and "never did any drugs." (Tr. at 791). A subsequent psychiatric consultation reflected that Claimant's "speech was markedly slurred and slow" and that "she looked intoxicated." (Tr. at 786). The consultative psychiatrist spoke with Claimant's parents, who related her drug abuse, medical, and legal histories. (*Id.*). Claimant was diagnosed with "anxiolytic and opiate intoxication; probable post-traumatic stress disorder related to history of surgical event at the age of five," and "ongoing substance use; anxiety about scheduled surgery tomorrow." (Tr. at 788). The psychiatrist recommended "at least short term transfer to Behavioral Medicine before surgery" so as to "attempt to stabilize her from a psychiatric standpoint," as well as decreasing Claimant's Xanax dosage. (*Id.*). Claimant was subsequently cleared for surgery, (Tr. at 782), and on January 9, 2009, her accessory spleen was removed without complication. (Tr. at 785). Following the operation, Claimant repeatedly requested that her Xanax dosage be increased, but was refused per the physician's orders. (Tr. at 783-84).

On June 5, 2009, intake assessment from the Kentucky Department of Corrections reflected that a "well healed horizontal surgical scar LUQ" was observed on Claimant's abdomen. (Tr. at 861). Claimant was also medically cleared to work inmate jobs except for landscape mowing, and was restricted to "no lifting greater than 5 lbs." (Tr. at 921). On July 28, 2009, Claimant "complained of not receiving muscle relaxers for her spleen procedure." (Tr. at 857). On February 24, 2010, Claimant requested "something for spasm related to her LUQ scar." (Tr. at 829). However, the treating physician noted that "while showing [the doctor] her scar, [Claimant] sneezed and made no facial grimace nor did she grab her side. Exam reveals no evidence of hernia. Scar well healed." (*Id.*).

On April 15, 2010, Claimant was treated for shortness of breath precipitated by exercise in the form of landscaping, (Tr. at 824), which was later determined to be an asthma attack. (Tr. at 823). Treatment notes from April 21, 2010 indicate that Claimant's asthma, coughing, and wheezing "problems have increased over last month due to outside job in landscape, but she wants to keep it." (Tr. at 817).

### B. State Agency Evaluations and Opinions

#### 1. 2004 Mental Evaluations

On July 20, 2004, licensed psychologist David E. Frederick, Ph.D., conducted an adult mental profile of Claimant, which consisted of a clinical interview regarding Claimant's medical history and presenting problems; a mental status examination; and two standardized psychological tests. (Tr. at 254-58).

During the interview, Claimant reported suffering from "cirrhosis, bipolar disorder, depression, panic attacks, blood flows backwards (in a stomach shunt), high blood pressure, hypothyroidism and problems sleeping." (Tr. at 254). Dr. Frederick reviewed some of Claimant's medical and mental health history, which included treatment at St. Mary's Hospital for "2 days after drug overdose" in June 2004, but nevertheless listed Claimant's substance abuse history as "none." (Tr. at 254-55). During the mental status evaluation, Claimant denied delusions and suicidal/homicidal ideations, but reported having obsessive thoughts and compulsively counting all the time "due to boredom, to stop thinking"; her insight was "uncertain" as she declined to talk about the cause of her problems, mood was depressed and anxious, judgment was severely deficient (based upon her WAIS-III Comprehension subtest score), recent memory was moderately deficient, remote memory was mildly deficient, and concentration was moderately deficient. (Tr. at 255-56). Claimant's orientation,

appearance, attitude, social interaction, speech, affect, thought process, perception, immediate memory, and psychomotor behavior were within normal limits or otherwise appropriate. (*Id.*).

On the Wechsler Adult Intelligence Scale (WAIS-III), Claimant scored 64, 67, 69, and 72 for verbal IQ, verbal comprehension, performance IQ, and perceptual organization, respectively, while her full scale IQ was assessed at 63. (Tr. at 256). Dr. Frederick deemed these scores to be both internally and externally valid as Claimant was adequately persistent and focused on all sets, the difference in VIQ and PIQ was not statistically significant, and they were consistent with Claimant's education, work history, clinical interview, and her WRAT3 achievement test results, which reflected reading, spelling, and arithmetic skills corresponding with grade levels of 3, 2, and 4, respectively. (Tr. at 257).

Dr. Frederick assessed Claimant with mild mental retardation based upon her intellectual functioning testing; Attention-Deficit/Hyperactivity Disorder (ADHD), based upon her self-assessment behavior checklist provided "as a result of her describing multiple effect in childhood and adulthood stemming from ADHD"; and Post Traumatic Stress Disorder (PTSD), based upon her report and description of symptoms associated with PTSD. (Tr. at 257-58). Dr. Frederick described her prognosis as "poor" but noted that her prognosis "would be at least fair with weekly psychotherapy for 6-12 months for PTSD and to learn ADHD coping skills (with or without ADHD medication)." (Tr. at 258). Dr. Frederick described Claimant's activities of daily living as including watching television, cooking by microwave, and doing laundry and housekeeping, although Claimant's boyfriend noted that Claimant "won't stay at the sink long enough to do dishes." (*Id.*). Finally, Dr. Frederick noted that Claimant's persistence

and pace were within normal limits, but she was not competent to manage her own finance. (*Id.*).

On September 7, 2004, Dr. Joseph Kuzniar, completed a psychiatric review technique, based upon the evaluation by Dr. Frederick. (Tr. at 259-72). Dr. Kuzniar opined that Claimant met Listing 12.05C, based upon her mental retardation, anxiety-related disorders, and organic mental disorder. (Tr. at 259). Dr. Kuzniar assessed Claimant with ADHD, PTSD, and mental retardation, with "a valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function." (Tr. at 260, 263-64). Dr. Kuzniar opined that as a result of her mental impairments, Claimant had mild limitations in her activities of daily living; moderate difficulties maintaining social functioning and maintaining concentration, persistence, or pace; and no episodes of decompensation of extended duration. (Tr. at 269). Accordingly, Dr. Kuzniar opined in his handwritten notes that "she will meet 12.05C." (Tr. at 271).

### 2. 2008 Mental Evaluations

On September 15, 2008, licensed psychological associate Mary Lou Cantrell, M.A., conducted a psychological evaluation of Claimant, which was approved by licensed clinical psychologist, Andrea D. Evans, Psy.D. (Tr. at 609-16). The evaluation consisted of a clinical interview regarding Claimant's medical history and presenting problems, a client questionnaires, a mental status examination, and three standardized psychological tests. (*Id.*).

During the interview, Claimant reported suffering from "cirrhosis, bipolar disorder, depression, and panic attacks," as well as "mental incompetency, adult ADHD, [and] posttraumatic stress syndrome." (Tr. at 609). Ms. Cantrell observed that

Claimant's appearance, orientation, eye contact, fine and gross motor coordination, speech, psychotic process, thought process, insight, and judgment were all within normal limits or otherwise appropriate, and Claimant denied current suicidal and homicidal ideations, substance abuse, hallucinations, and delusions. (Tr. at 610). However, following an exchange in which Claimant was told that her husband could not be present during test administration, Claimant "presented as superficially cooperative throughout the evaluation," giving "belligerent and flippant responses" to subtest questions. (*Id.*). Claimant's affect was "sulky and belligerent," while her overall attitude was "inappropriate and she maintained a presentation of poor effort and interest." (*Id.*).

Claimant provided a vague criminal history, in which she indicated that she was "in jail one time for being drunk," and that "she had received services from Pathways, Inc." while incarcerated thirteen or fourteen months prior. (Tr. at 611). Claimant also reported a history of psychiatric hospitalization and psychotherapy, but indicated that she was "not currently in treatment and stated she does not think she would benefit from treatment at this time." (Tr. at 612). Claimant reported using cocaine "a long time ago," but "[o]ther illicit and/or IV drug use, past or present was denied," as was current use of alcohol. (*Id.*). During the interview, Claimant reported that "she has no difficulty conducting basic financial management necessary to purchase groceries, household good, and pay bills." (Tr. at 611). Regarding daily activities, Claimant reported limited social interactions and no regularly scheduled activities, but indicated that "[s]he is psychologically able to conduct daily housecleaning, personal hygiene, and can go to the grocery store independently as needed." (Tr. at 612). Although Claimant reported "poor interpersonal relationships with family members and prior supervisors and coworkers," she "demonstrate[d] the ability to sustain attention to tasks and to complete tasks in a

timely fashion." (*Id.*).

On the WAIS-III test, Claimant scored 62, 63, 60, and 60 for verbal IQ, verbal comprehension, performance IQ, and perceptual organization, respectively, while her full scale IQ was assessed at 58. (Tr. at 613). On the WRAT-4 achievement test, Claimant's scores reflected word reading, spelling, and math computation skills corresponding with grade levels 4.3, 3.7, and 4.3, respectively. (Tr. at 614). Although the results of both tests reflected "extremely low" range functioning, Ms. Cantrell cautioned that "[i]t is believed that Ms. Finley presented in a manner less than consistent with her abilities," and therefore Claimant's test results were "believed to be an under estimate of her current level of functioning." (Tr. at 612). Given Claimant's REY 15-Item "Memory" Test results, in which she recalled only two of five sets of characters, Ms. Cantrell opined that Claimant was "attempt[ing] to exaggerate symptoms on this instrument."[2]  (Tr. at 614).

Ms. Cantrell assessed Claimant with "Malingering, Anxiety Disorder NOS, Nicotine Dependence, and Antisocial Personality Disorder, primary," and assigned her a GAF score of 67, based upon Claimant's reported history, test scores, and presentation during the evaluation. (Tr. at 614-15). Ms. Cantrell ruled out bipolar disorder, noting that Claimant's "description [of symptoms] lacked the detail and experiential quality typically observed in an individual with bipolar disorder." (Tr. at 614). Ms. Cantrell further stated that "[w]hile it is believed that [Claimant] does indeed have some cognitive limitations, her apparent attempts to malinger on this evaluation make those

---

[2] According to information provided by Ms. Cantrell, the REY 15-Item "Memory" Test is "a nonverbal memory task, which is designed to determine the validity of complaints of memory impairment. The task consists of a 10 second exposure to five rows of three characters, and the subject is instructed to recall all of the 15 items in order to provide the impression that the task is difficult. Results of research on this task have indicated that with the exception of those with severe brain injury or mental retardation, individuals recall a minimum three of five sets of character. If a subject recalls fewer than three sets, it can be deduced that the person has exerted inadequate effort and motivation." (Tr. at 614).

limitations difficult to assess. Therefore, no diagnosis regarding her intellectual functioning is made at this time." (*Id.*).

Ms. Cantrell described Claimant's prognosis as "good," explaining that "while it is believed that her symptoms are primarily characterological in nature and will resist change, they are not severe enough to preclude her obtaining and maintaining some form of gainful employment." (Tr. at 615). Based upon her objective findings and the results of the evaluation, Ms. Cantrell opined that Claimant was "not significantly psychologically limited in her ability to function in an occupational capacity." (*Id.*). Specifically, Ms. Cantrell noted that Claimant demonstrated abilities to understand and remember simple instructions; there was no evidence of disturbance in sustained concentration and/or persistence; and although there was some evidence of dysfunction in social interaction, Claimant had "the resources available to adapt and respond appropriately to pressures normally found in the day-to-day work setting." (Tr. at 615). Finally, Ms. Cantrell opined that Claimant would be able to appropriately manage funds in her best interest. (Tr. at 616).

On October 1, 2008, Dr. Ilze Sillers, Ph.D. provided a psychiatric review technique and mental RFC opinion of Claimant, based upon medical records and the evaluations by Dr. Frederick and Ms. Cantrell. (Tr. at 621-38). Dr. Sillers assessed Claimant with ADHD per history, Anxiety NOS, Antisocial Personality Disorder, and Polysubstance Abuse per history, (Tr. at 622, 626, 628-29). Dr. Sillers opined that as a result of her mental impairments, Claimant had mild limitations in her activities of daily living; moderate difficulties maintaining social functioning and maintaining concentration, persistence, or pace; and no episodes of decompensation of extended duration. (Tr. at 631). Accordingly, Dr. Sillers opined that the evidence did not establish

27

that Claimant meets any of the relevant Listing criteria. (Tr. at 632). Regarding Claimant's mental RFC, Dr. Sillers opined that Claimant was moderately limited in her abilities to maintain attention and concentration for extended periods, to interact appropriately with the general public, to respond appropriately to changes in the work setting, and to set realistic goals or make plans independently of others; but that she was not significantly limited in any other functions relating to understanding and memory, sustained concentration and persistence, social interaction, or adaptation. (Tr. at 635-36).

Regarding mental treatment history, Dr. Sillers noted that Claimant was "not seeking mental health treatment but reports that she sought services from Pathways from 2000 to 2007 and from Prestera Center for mental health [treatment] from 2000 to 3/2007." (Tr. at 637). Dr. Sillers observed that Claimant was apparently only treated for physical problems while incarcerated for 18 months for trafficking, and that the "FO reported no notable mental issues and indicated that capability did not appear to be an issue." (*Id.*). Dr. Sillers noted from Claimant's prior treatment records "a history of alcohol and cocaine abuse with multiple positive drug tests, suicide gestures and narcotic seeking behavior." (*Id.*). Regarding Claimant's Pathways treatment records for ADHD, Dr. Sillers observed that "[t]here were no mental retardation issues noted," "one of her hobbies was noted to be reading," and that "she filled out numerous forms with excellent writing and spelling." (*Id.*).

Dr. Sillers did consider Claimant's prior grant of benefits in 2004 for disability under Listing 12.05C, but stated that "given current case finding, her IQ scores in the 60 are questionable and not consistent with current [consultative examiner] observations." (*Id.*). Accordingly, Dr. Sillers gave little weight to the opinions of Dr. Frederick, and

great weight to the opinions of Ms. Cantrell. (*Id.*). Dr. Sillers found Claimant's allegations of restrictions to be only partially credible, (Tr. at 637), and instead opined that Claimant had the mental RFC to:

> Understand, remember and carry out simple instructions and detailed tasks with some concrete variables. She can maintain concentration and attention for two hour segments over an eight hour period. Complete a normal workweek without excessive interruptions from psychologically based symptoms. Demonstrate adequate judgment and make adequate decisions. Respond appropriately to supervisors and co-workers and can generally work with things rather than people. Claimant is capable of maintaining appropriate hygiene and dress suitable to that work place. Adapt to routine changes and avoid hazards on a sustained basis.

(Tr. at 638).

On November 24, 2008, Dr. Ann Demaree, Ph.D. provided a psychiatric review technique and mental RFC opinion of Claimant. (Tr. at 723-40). After reviewing Claimant's records on "recon[sideration] with no new mental allegations or MER," Dr. Demaree "affirmed as written" both the psychiatric review technique and mental RFC opinion provided by Dr. Sillers. (Tr. at 735, 739).

### 3. Physical Evaluations

On October 8, 2008, Dr. Carlos X. Hernandez, M.D. completed a case analysis of Claimant's alleged physical impairments. (Tr. at 639). Regarding Claimant's history of congenital cirrhosis of the liver, Dr. Hernandez noted that she is "S/P splenorenal shunt on the left side at a very young age," has a history of splenomegaly at age 5 years with splenectomy, and a history of drug abuse including alcohol. (*Id.*). Dr. Hernandez observed that her "liver function tests in 01/07 were normal" and that "[t]here are no recent studies available for review." (*Id.*). Regarding Claimant's headaches, Dr. Hernandez noted that they were "not of the severity or frequency to further affect function" and that her "MRI of the brain performed on 10/27/05 was negative." (*Id.*).

Regarding Claimant's allegation that her back and liver sclerosis affected her ability to lift, squat, bend over, stand, reach, kneel, and climb stairs, Dr. Hernandez stated that "[s]uch a severe degree of restriction [is] not supported by objective findings and [is] considered not entirely credible." (*Id.*). Further, Dr. Hernandez noted that there were "no medical opinions" on record, and that Claimant's "condition [is] considered non-severe." (*Id.*).

On January 2, 2009, Dr. David S. Swan, M.D. completed a case analysis in light Claimant's recent medical treatment for acute appendicitis. (Tr. at 780). Dr. Swan observed that in the process of evaluating her appendicitis, "a right infra-renal 4-5 cm mass was identified and after considerable evaluation has been found to most likely represent a hypertrophied accessory spleen, residual and hypertrophied secondary to her prior childhood splenectomy." (*Id.*). Dr. Swan noted that "[t]he record does not indicate any mechanical or physiological impairments as a result of this incidental finding," and accordingly "[t]he prior not severe determination [was] confirmed on review. (*Id.*). Thus, Dr. Swan found that "singly or in combination the Claimant's alleged impairments are NOT SEVERE." (*Id.*) (emphasis in original).

## VI.   **Standard of Review**

The issue before the Court is whether the final decision of the Commissioner is based upon an appropriate application of the law and is supported by substantial evidence. *See Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). In *Blalock v. Richardson,* the Fourth Circuit Court of Appeals defined "substantial evidence" to be:

> [E]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Blalock*, 483 F.2d at 776 (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). This Court is not charged with conducting a *de novo* review of the evidence. Instead, the Court's function is to scrutinize the totality of the record and determine whether substantial evidence exists to support the conclusion of the Commissioner. *Hays v. Sullivan,* 907 F.2d 1453, 1456 (4th Cir. 1990). Thus, the decision for the Court to make is "not whether the claimant is disabled, but whether the ALJ's finding of no disability is supported by substantial evidence." *Johnson v. Barnhart,* 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater,* 76 F.3d 585, 589 (4th Cir. 2001)). If substantial evidence exists, then the Court must affirm the Commissioner's decision "even should the court disagree with such decision." *Blalock*, 483 F.2d at 775.

## VII.  <u>Discussion</u>

As previously stated, Claimant's sole challenge to the Commissioner's decision involves the ALJ's evaluation of Claimant's impairments under Listing 12.05C. In particular, Claimant argues that the ALJ improperly failed to consider whether Claimant's spleen and liver problems constituted an "additional and significant work-related limitation of function." According to Claimant, this analysis should have been performed for the simple reason that the ALJ found Claimant's spleen and liver problems to be severe impairments at step two of the sequential evaluation process. Because severe impairments, by definition, impose significant limitations on an individual's ability to do work-related functions, the ALJ should have determined whether Claimant's liver and spleen disorders met the criteria of 12.05C.[3] The

---

[3] An impairment or combination of impairments is severe when it significantly limits a claimant's ability to do basic work activities. "Basic work activities" include, for example, (1) physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) capacities for seeing, hearing, and speaking; (3) understanding, carrying out, and remembering simple instructions; (4) use of judgment; (5) responding appropriately to supervision, co-workers and usual work situations; and (6) dealing with changes in a routine work setting. 20 C.F.R. §§ 416.921(c).

undersigned agrees with Claimant that the ALJ's 12.05C analysis was deficient and thus requires remand for further consideration of whether Claimant met the severity criteria of that listing.

Section 12.00 of the Listing pertains to Mental Disorders, which are arranged in nine diagnostic categories, including listing 12.05 (intellectual disorders). 20 C.F.R. Pt. 404, Subpt. P, App'x 1 § 12.00. According to the regulations:

> The structure of the listing for intellectual disability (12.05) is different from that of the other mental disorders listings. Listing 12.05 contains an introductory paragraph with the diagnostic description for intellectual disability. It also contains four sets of criteria (paragraphs A through D). If [a claimant's] impairment satisfies the diagnostic description in the introductory paragraph and any one of the four sets of criteria, [the SSA] will find that [the] impairment meets the listing.

*Id.* The diagnostic description for intellectual disability is "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period, i.e., the evidence demonstrates or supports onset of the impairment before age 22." 20 C.F.R. Part 404, Subpart P, App'x 1 § 12.05. Once the claimant has established intellectual dysfunction meeting the diagnostic description, she can demonstrate the requisite level of severity under paragraph C by showing "a valid verbal, performance, or full scale IQ of 60 through 70 **and** a physical or other mental impairment imposing an additional and significant work-related limitation of function." *Id.* § 12.05C (emphasis added); *Hancock v. Astrue*, 667 F.3d 470, 473 (4th Cir. 2012). Thus, to be disabled under listing 12.05C, the claimant must meet all three prongs of the severity criteria. In regard to the third prong, the Social Security regulations explain that the degree of functional limitation imposed by the additional impairment must be assessed to determine if it significantly limits the claimant's physical or mental ability to do basic work activities, "i.e., is a "severe" impairment(s), as defined in §§ 404.1520(c)

and 416.920(c)." 20 C.F.R. Pt. 404, Subpt. P, App'x 1 § 12.00. If the additional impairment does not result in limitations that are '"severe" as defined in §§ 404.1520(c) and 416.920(c)," the additional impairment does not impose "an additional and significant work-related limitation of function."[4] *Id.*

In the instant case, the ALJ concluded that Claimant met the first two prongs of listing 12.05C, but failed to demonstrate the third prong in light of the role her substance use disorders played in the severity of her additional impairments. The undersigned **FINDS** that the ALJ's decision in this regard is not supported by substantial evidence for two reasons. First, the ALJ's written decision is internally inconsistent, and fails to resolve conflicts in the record. Second, the ALJ did not adequately evaluate whether Claimant's substance use disorders were contributing factors material to the determination of disability because the ALJ failed to review and analyze mental health records prepared during periods of abstinence. As a result of these errors, the ALJ's determination at the third step of the sequential evaluation is flawed and thus necessitates remand for consideration of whether Claimant's impairments met the severity criteria of listing 12.05C.

---

[4] The United States Court of Appeals for the Fourth Circuit ("Fourth Circuit') has not restricted the meaning of "significant work-related limitation" in 12.05C to the definition of "severe impairment" found at §§ 404.1520(c) and 416.920(c). Instead the Fourth Circuit has explained the term in context of its peripheries. The Court has stated that a "significant limitation under section 12.05C need not be disabling in and of itself." *Branham v. Heckler*, 775 F.2d 1271, 1273 (4th Cir. 1985). That is, "something less than a preclusion from any substantial gainful employment must apply." *Id.* Thus, "if a claimant cannot return to his past relevant work, he has established a work-related limitation of function which meets the requirements of § 12.05C" regardless of whether the impairment is found to be severe. *Flowers v. United States Dep't of Health & Human Servs.*, 904 F.2d 211, 214 (4th Cir. 1990); *see also Branham*, 775 F.2d at 1273-74. ). Additionally, the Fourth Circuit has held that "[a]n illness or injury imposes a significant limitation when its effect on the claimant's ability to work is more than slight or minimal." *Pullen v. Bowen*, 820 F.2d 105, 109 (4th Cir. 1987). The Court acknowledges that an additional severe impairment or combination of impairments will automatically establish the third prong of section 12.05C, as "the Secretary has defined a severe impairment or combination of impairments as those which significantly limit an individual's physical or mental ability to do basic work activities." *Luckey v. United States Dep't of Health & Human Servs.*, 890 F.2d 666, 669 (4th Cir. 1989); *Berry v. Astrue*, No. 3:10-cv-00430, 2011 WL 2462704, at *14 (S.D.W.V. Jun. 17, 2011).

At the second step of the evaluation process, the ALJ expressly found that Claimant's severe impairments included "**status post splenectomy**; mental retardation; anxiety; depression; post traumatic stress disorder (PTSD); cocaine abuse in questionable remission; alcohol abuse; substance abuse; and **congenital cirrhosis**." (Tr. at 27) (emphasis added). This finding forms the basis of Claimant's contention that her liver and spleen disorders should have been considered at the third step of the disability determination. However, other portions of the ALJ's decision conflict with this initial finding, ultimately leaving the reviewer to question whether Claimant's liver and spleen problems were considered severe or nonsevere. For example, after including Claimant's splenectomy and cirrhosis in the list of severe impairments, the ALJ stated:

> The claimant has a history of congenital cirrhosis of the liver and had her spleen removed at a very young age. (Exhibit 22F, pg. 1). In January 2009, Ms. Finley had surgery to remove an accessory spleen. (Exhibit 24F). The claimant was noted to have no complications following her January 2009 surgery, and all liver function tests have been normal. (Exhibit 7F, pg. 34 & 14F, pg. 13) The undersigned notes no additional treatment following the claimant's January 2009 surgery. Therefore, her liver and spleen impairments are nonsevere.

(*Id.*). Compounding the confusion created by these two contradictory statements, the ALJ subsequently considered Claimant's liver impairment under Section 5.00 of the Listing, thereby implying that she found the impairment to be severe after all. (Tr. at 32). *See Craft v. Astrue*, No. 5:07-00237, 2008 WL 4415037, at *2 n.1 (S.D.W.V. Sept. 25, 2008). Moreover, when assessing Claimant's RFC, the ALJ remarked that "because the claimant has had a history of liver and spleen conditions, the undersigned has afforded the claimant the benefit of doubt regarding her testimony and determined that Ms. Finley would be unable to perform work above the medium exertional level." (Tr. at 35). The ALJ did not provide a function-by-function assessment of Claimant's physical

limitations or otherwise elaborate as to how Claimant's testimony about her liver and spleen impairments corresponded with "medium level" work, but by restricting Claimant's exertional level due to "liver and spleen conditions," the ALJ again suggested that these impairments had more than a minimal effect on Claimant's ability to work. *See* Social Security Ruling 85-28, 1985 WL 56856, at *3. To further confuse the issue, elsewhere in the decision, the ALJ stated that she "afforded great weight to the State agency's assessment indicating that the claimant did not suffer from a severe impairment because her liver tests are normal and because she has not had any medical treatment since her accessory spleen was removed in January 2009." (Tr. at 35).

Neither party attempts to reconcile these obvious internal inconsistencies in the written decision. Claimant merely argues the excerpts that benefit her case, and ignores the rest. The Commissioner likewise sidesteps the issue by adopting the portions of the decision describing Claimant's liver and spleen conditions as nonsevere. The Commissioner then bolsters her position by contending that Claimant also failed to identify any limitations related to her liver and spleen conditions. However, the Commissioner's contention is not supported by the record and plainly differs from the conclusion reached by the ALJ. The ALJ distinctly accepted that Claimant had limitations related to her spleen and liver disorders and accordingly reduced Claimant's exertional level to account for those limitations. (Tr. at 35).

Ultimately, the ALJ's written decision is ambiguous as to the severity of Claimant's liver and spleen impairments. While it is conceivable that the ALJ accidently included "status post splenectomy" and "cirrhosis of the liver" on the list of severe impairments, it is equally conceivable that she believed those impairments made more than a minimal impact on Claimant's ability to do basic work activities. The undersigned

simply is not charged with reconciling conflicts in the record or speculating about the ALJ's intention. Indeed, no more than speculation is possible. Contrary to the Commissioner's contention, the record does contain evidence of limitations associated with Claimant's liver and spleen disorders. Claimant testified at the administrative hearing that she "throw[s] up blood all the time," that "it comes out [her] ears, and [her] nose, and [her] mouth," and that she feels very weak. (Tr. at 51). Claimant reported that she spoke to her doctor, who informed her that these symptoms were due to cirrhosis of the liver. (Tr. at 51). Claimant also testified to suffering constant pain in her abdomen and the "lower part of [her] back on the inside," as a consequence of her liver condition. (Tr. at 54-55). Furthermore, in an Adult Function Report, she indicated that her liver and back pain limited her ability to lift, bend over, stand, reach, walk, kneel, and climb stairs. (Tr. at 199). She also offered a medical clearance form dated June 5, 2009 prepared by a physician or nurse at the Kentucky Correctional Institute for Women, which restricted her to light duty with no lifting greater than 5 pounds. (Tr. at 921). Other records from the correctional facility document that Claimant had a shunt in her liver, took aspirin on a daily basis to thin her blood, and experienced multiple incidents of vomiting. Consequently, the record contains evidence supporting the existence of limitations related to Claimant's chronic liver and spleen disorders, and conflicting evidence as to the severity of those limitations.

Moreover, the ALJ's express reasons for discounting the severity of Claimant's liver and spleen conditions are factually inaccurate. According to the ALJ, she gave great weight to Dr. Swan, the agency expert who opined that Claimant's liver and spleen impairments were nonsevere "because her liver tests are normal and because she had not had any medical treatment since her accessory spleen was removed in January

36

2009." (Tr. at 27, 35). However, Dr. Swan wrote his opinion on January 2, 2009, seven days before Claimant's accessory spleen was removed. (Tr. at 780). Moreover, the opinion did not specifically address Claimant's liver function studies, and the liver function studies specifically relied upon by the ALJ predated Claimant's 2009 splenectomy.[5] In fact, the record contains several liver function studies performed after the 2009 surgery that were not entirely normal. (Tr. at 803, 811, 834). Furthermore, Claimant received regular medical services while incarcerated in 2009 and 2010 that included monitoring of her liver and spleen conditions. (Tr. at 809-867).

Having determined that the ALJ's treatment of Claimant's liver and spleen impairments was deficient, the undersigned next considers whether Claimant was prejudiced by the ALJ's error. This inquiry must be answered in the affirmative given that Claimant's qualification for benefits under listing 12.05C hinged on the existence of an additional severe impairment. The ALJ remarked that Claimant's previous award of benefits on September 17, 2004 was based upon a determination that she met Listing 12.05C because she had a severe intellectual disability and an additional severe mental impairment. (Tr. at 29). In 2004, Dr. David Frederick diagnosed Claimant with "mild mental retardation" at age 21 when she was found to have a valid full scale IQ score of 63; thus, Claimant met the diagnostic description of listing 12.05C, as well as the requirement of a valid IQ score between 60 and 70. (Tr. at 29, 254-58). Another agency expert, Dr. Joseph Kuzniar subsequently opined that Claimant met Listing 12.05C in light of her diagnosis of mild mental retardation, her low IQ score, and the additional severe mental impairments of anxiety, PTSD, and the organic mental disorder of ADHD.

---

[5] The ALJ explicitly relies upon liver function studies from January 2007 and September 2008. (Tr. at 27, 424, 652). The surgery did not occur until January 9, 2009. (Tr. at 784-85).

(Tr. at 30-31, 259-72). Although the ALJ expressed skepticism about the accuracy of Dr. Frederick's diagnosis,[6] she explicitly gave it great weight, thus accepting that Claimant met the diagnostic description and IQ range required by listing 12.05C. However, the ALJ ultimately found that Claimant did not qualify for benefits under the listing, because she could no longer meet the third prong of 12.05C; that being, the existence of a "physical or other mental impairment imposing an additional and significant work-related limitation of function." According to the ALJ, Claimant's mental impairments of anxiety, depression, and PTSD no longer fulfilled the third prong given that Claimant's substance abuse was a contributing factor material to the severity of these impairments. In other words, the ALJ found that if Claimant stopped abusing substances, her psychological impairments would not impose an additional and significant work-related limitation of function. Although the ALJ found that Claimant's "mental health impairments are the result of continued alcohol and drug use," the ALJ plainly did not consider whether Claimant's spleen and liver impairments satisfied the third prong of Listing 12.05C. (Tr. at 31-32). If the ALJ found that Claimant's liver and spleen conditions were severe impairments, then at a minimum, the ALJ should have separately assessed whether they met the third prong of 12.05C. Indeed, applying the law in the Fourth Circuit, a finding that these conditions were severe impairments, even without a separate assessment of their functional limitations, would qualify Claimant for

---

[6] The Commissioner argues that Claimant did not meet the diagnostic description of 12.05C and contends that "no valid verbal, performance, or full scale IQ of 60 through 70 was presented during the relevant time period." (ECF No. 13 at 11). However, the ALJ accepted Claimant's 2004 IQ results as valid and found that Claimant met the first two prongs of 12.05C. The ALJ's subsequent denial of benefits to Claimant under 12.05C was not based upon the lack of a diagnosis of mental retardation or the absence of supporting IQ findings. Instead, the denial was based upon a determination that Claimant's other mental impairments were not sufficiently severe to impose an "additional and significant work-related limitation of function." (Tr. at 30-31). On remand, the ALJ may wish to clarify whether Claimant meets the diagnostic description and IQ requirements of 12.05C.

disability benefits under 12.05C. *See Luckey v. United States Dep't of Health & Human Servs.*, 890 F.2d 666, 669 (4th Cir. 1989); *Berry v. Astrue*, No. 3:10-cv-00430, 2011 WL 2462704, at *14 (S.D.W.V. Jun. 17, 2011). Therefore, the severity of Claimant's liver and spleen disorders was a critical factor to the disability determination. In view of the confusion surrounding that issue, the ALJ's decision must be remanded for consideration of whether Claimant's liver and spleen conditions were severe and fulfilled the third prong of listing 12.05C.

In addition, the undersigned **FINDS** that the ALJ did not consider evidence highly relevant to the materiality of Claimant's substance use disorders when making the disability determination. Title 42 U.S.C. § 1382c(a)(3)(J) states that "[a]n individual shall not be considered disabled ... if alcoholism or drug addiction would (but for this subparagraph) be a contributing factor material to the Commissioner's determination that the individual is disabled." Accordingly, if a claimant is found to be disabled, but is also found to have a drug or alcohol addiction, the ALJ must assess whether the addiction is a substantial contributing factor to the claimant's disability. Title 20 C.F.R. § 416.935 explains how this assessment is made, stating:

> (a) General. If we find that you are disabled and have medical evidence of your drug addiction or alcoholism, we must determine whether your drug addiction or alcoholism is a contributing factor material to the determination of disability, unless we find that you are eligible for benefits because of your age or blindness.
>
> (b) Process we will follow when we have medical evidence of your drug addiction or alcoholism.
>
> (1) The key factor we will examine in determining whether drug addiction or alcoholism is a contributing factor material to the determination of disability is whether we would still find you disabled if you stopped using drugs or alcohol.
>
> (2) In making this determination, we will evaluate which of your current physical and mental limitations, upon which we based our current

disability determination, would remain if you stopped using drugs or
alcohol and then determine whether any or all of your remaining
limitations would be disabling.

(i) If we determine that your remaining limitations would not be disabling,
we will find that your drug addiction or alcoholism is a contributing factor
material to the determination of disability.

(ii) If we determine that your remaining limitations are disabling, you are
disabled independent of your drug addiction or alcoholism and we will
find that your drug addiction or alcoholism is not a contributing factor
material to the determination of disability.

As the regulation indicates, the crucial question in this analysis is whether the
claimant continues to have disabling impairments when not using drugs or alcohol. It
stands to reason that treatment records from periods of abstinence would provide the
best evidence of the severity of a claimant's other impairments when she is not in the
throes of substance abuse.[7] *See Salazar v. Barnhart,* 468 F.3d 615, 623 (10th Cir. 2006).
Here, the ALJ found that Claimant's impairments, when including her substance use
disorders, met listing 12.05C. (Tr. at 29). Therefore, the ALJ proceeded to determine
whether substance abuse was a contributing factor material to the disability finding.
After considering some of Claimant's medical records, her criminal history, and her
intoxicated appearance at the administrative hearing, the ALJ noted that "new and
additional evidence has been submitted at the hearing level to show that since
claimant's original meeting of 12.05C, she has been found to have significant substance
abuse as a contributing factor material to the determination of her mental impairments
of anxiety, depression, and PTSD." (Tr. at 29-31). As a result, the ALJ concluded that
Claimant's "substance abuse (both alcohol and drug) was a contributing factor that is

---

[7] In February 2013, the SSA issued SSR 13-2P, 2013 WL 621536, to provide guidance on how it considered
the effect of drug or alcohol addiction on the determination of disability. Although this Ruling was not
available at the time the ALJ made her decision, it also recognizes the obvious usefulness of evidence from
periods of abstinence. *Id.*

material to the determination of disability regarding the claimant's mental impairments of anxiety, depression, and post-traumatic stress disorder," and consequently found that "she does not continue to meet Listing 12.05C." (Tr. at 30). Notably, when reaching this conclusion, the ALJ seemingly overlooked and certainly failed to discuss medical records prepared during periods of abstinence. For that reason, the undersigned finds a significant gap in the ALJ's analysis.

The record is replete with evidence that Claimant had significant drug and alcohol abuse disorders. Nonetheless, there are records from two periods of abstinence that should have been explicitly addressed by the ALJ when performing the substance abuse analysis. The first occurred between February and April 2009.[8] On April 15, 2009, Claimant was admitted to the behavioral health unit of King's Daughters Medical Center with "an upsurge in anxiety and self-destructive behavior." She had begun to cut herself in order to ease her feelings of anxiety, which prompted her husband to bring her to the hospital. (Tr. at 798). Claimant complained of longstanding panic attacks with nightmares and flashbacks that had worsened since she stopped taking psychotropic medications a few months earlier. She reported losing 40 pounds in two months; hearing voices; having paranoia, racing thoughts, manic episodes, and mood swings. (Tr. at 799). A comprehensive drug screen was negative, and nothing in the record suggests that Claimant was intoxicated at that time. Claimant was diagnosed with Post-traumatic stress disorder, chronic, with acute exacerbation; depression, not otherwise specified; rule out major depression, severe with psychotic features; anxiety, not

---

[8] The ALJ does refer to Exhibit No. 26, which is a collection of records from Claimant's April 2009 visit to King's Daughters Medical Center. (Tr. at 30). However, the ALJ fails to note that Claimant's drug screen was negative during this admission. Similarly, the ALJ does not reconcile the significant exacerbation of Claimant's psychiatric symptoms during this time of abstinence with the ALJ's finding that Claimant's psychological impairments were not severe in the absence of substance abuse.

otherwise specified, with panic and agoraphobia. Her Global Assessment of Functioning score was 36, indicating significant psychiatric distress.[9] At that time, Claimant's mood instability was so marked that the treating physician was hesitant to place her on anti-depressants. (Tr. at 800). While this particular episode may have been nothing more than short-term distress caused by Claimant's termination of psychotropic medications, the ALJ made no effort to resolve the inconsistency between this evidence and her determination that Claimant's psychiatric symptoms were nondisabling in the absence of substance abuse.

Claimant's second period of abstinence occurred during her term of incarceration from June 2009 through July 2010. (Tr. at 809-869). On June 2, 2009, Claimant was assessed by the medical unit at the Kentucky Correctional Institute for Women. (Tr. at 868-69). She reported taking medication for psychiatric disorders and having a history of drug and alcohol use, stating that she last used them on May 10, 2009. Claimant described her psychiatric problems as including depression, excessive worry, suicidal thoughts, and "bad panic attacks," and she claimed to have a diagnosis of bipolar disorder and paranoid schizophrenia, which was treated with Thorazine. (Tr. at 867). During the thirteen months of her incarceration, Claimant was seen regularly for follow-up of her psychiatric condition. Her symptoms appeared to wax and wane. At times, she

---

[9] The Global Assessment of Functioning ("GAF") Scale is a 100-point scale that rates "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness," but "do[es] not include impairment in functioning due to physical (or environmental) limitations." *Diagnostic Statistical Manual of Mental Disorders*, Americ. Psych. Assoc, 32 (4th Ed. 2002) ("DSM-IV"). On the GAF scale, a higher score correlates with a less severe impairment. A GAF score of 31-40 indicates that the patient had some impairment in reality testing or communication (e.g. speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g. depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school). It should be noted that in the latest edition of the *Diagnostic and Statistical Manual of Mental Disorders*, DSM-5, the GAF scale was abandoned as a measurement tool.

reported cutting on herself, stopping her medications, experiencing anxiety, and grogginess. She had symptoms of auditory hallucinations, depression, panic attacks, mood swings, social anxiety, and anxiety attacks. In December 2009, Claimant was found hallucinating in her cell, claiming that spiders were crawling all over her and biting her. (Tr. at 842). Undoubtedly, these constitute serious psychological symptoms. On the other hand, the records also contain entries that indicate symptom exaggeration or malingering by Claimant. For instance, Claimant's treating practitioner at the correctional facility commented that Claimant's affect did not really match the severity of her alleged symptoms. Moreover, Claimant was able to perform light duty work while incarcerated. Notwithstanding the persistence of Claimant's psychiatric impairments during this extended period of abstinence, the ALJ failed to closely examine the records, resolve the conflicts, and explain how these records informed her decision.[10] The ALJ's lack of attention to significant evidence undermines the validity of the ALJ's conclusion.[11]

The record in this case is well-developed; however, the written decision does not

---

[10]  When explaining Claimant's RFC determination, the ALJ confirmed that she had reviewed the records from Claimant's incarceration and found that they were not inconsistent with the limitations included in the RFC. She noted that Claimant's increase in psychiatric symptoms while incarcerated corresponded with Claimant's medication non-compliance. (Tr. at 35). Although this notation may explain the ALJ's reason for including or not including certain restrictions in the RFC assessment, it does not relieve the ALJ of her duty to carefully analyze the severity of Claimant's mental impairments at the third step of the sequential evaluation process when considering whether Claimant met the third prong of listing 12.05C.

[11] As Plaintiff points out, Emergency Message 92 200 provided guidance to the ALJ regarding the assessment of the materiality of drug and alcohol abuse on the disability determination. It stated, in part:

> We know of no research data upon which to reliably predict the expected improvement in a coexisting meal impairment(s) should drug/alcohol use stop. The most useful evidence that might be obtained in such cases is that relating to a period when the individual was not using drugs/alcohol. Of course, when evaluating this type of evidence consideration must be given to the length of the period of abstinence, how recently it occurred, and whether there may have been any increase in the limitations and restrictions imposed by the other mental impairments the last period of abstinence. When it is not possible to separate the mental restrictions and limitations imposed by DAA and the various other mental disorders shown by the evidence, a finding of 'not material' would be appropriate.

reflect a clear and thorough analysis of the evidence. For that reason, the undersigned **FINDS** that the ALJ's decision is not supported by substantial evidence.

## VIII.  <u>Recommendations for Disposition</u>

Based on the foregoing, the undersigned United States Magistrate Judge respectfully **PROPOSES** that the United States District Court confirm and accept the findings herein and **RECOMMENDS** that the District Court **GRANT** Plaintiff's motion for a remand, (ECF No. 12); **DENY** Defendant's Motion for Judgment on the Pleadings (ECF No. 13), **REVERSE** the final decision of the Commissioner, **REMAND** this matter pursuant to sentence four of 42 U.S.C. § 405(g) for further administrative proceedings to determine if  Claimant's liver, spleen, or mental impairments, in the absence of substance abuse, constitute an "additional and significant work-related limitation of function" under listing 12.05C; and **DISMISS** this action from the docket of the Court.

The parties are notified that this "Proposed Findings and Recommendations" is hereby **FILED**, and a copy will be submitted to the Honorable Robert C. Chambers, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and three days (mailing) from the date of filing this "Proposed Findings and Recommendations" within which to file with the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendations" to which objection is made, and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de*

*novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing party, Judge Chambers and Magistrate Judge Eifert.

The Clerk is directed to file this "Proposed Findings and Recommendations" and to provide a copy of the same to counsel of record.

**FILED:**  November 12, 2013.

Cheryl A. Eifert
United States Magistrate Judge